STATE OF LOUISIANA       *       NO. 2019-KA-0292

VERSUS       *

      COURT OF APPEAL

BRANDON R. LAURANT       *

      FOURTH CIRCUIT

      *

      STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 530-169, SECTION "K"
Honorable Arthur Hunter, Judge
* * * * * *
**JAMES F. MCKAY III**
**CHIEF JUDGE**
* * * * * *

(Court composed of Chief Judge James F. McKay III, Judge Paula A. Brown, Judge Dale N. Atkins)

LEON CANNIZZARO, JR.
DISTRICT ATTORNEY
ORLEANS PARISH
DONNA ANDRIEU
ASSISTANT DISTRICT ATTORNEY
CHIEF OF APPEALS
IRENA ZAJICKOVA
ASSISTANT DISTRICT ATTORNEY
619 S. White Street
New Orleans, Louisiana 70119
      COUNSEL FOR STATE/APPELLEE

Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, Louisiana 70158
      COUNSEL FOR DEFENDANT/APPELLANT

**CONVICTIONS AND SENTENCES AFFIRMED**

**JULY 31, 2019**

The defendant, Brandon R. Laurant, appeals his convictions and sentences for attempted manslaughter and illegal possession of a firearm by a convicted felon.  For the reasons set forth below, we affirm the defendant's convictions and sentences.

## STATEMENT OF THE CASE

On August 2, 2016, in a two count bill of information, the State charged the defendant in count 1 with attempted second degree murder, La. R.S. 14:(27)30.1, and in count 2 with illegal possession of a firearm by a convicted felon, La. R.S. 14:95.1.  The defendant pled not guilty to all charges.  The trial court found probable cause for attempted manslaughter, La. R.S. 14(27)31, instead of attempted second degree murder.

Prior to the start of trial on September 13, 2018, the State and defense stipulated to the defendant's two prior felony convictions. [1]  That same day, the

---

[1] The State and defense stipulated that the defendant had two previous felony convictions, either of which would have prohibited him from possessing a firearm for ten years, and at the time of the present offense, it would have been illegal for him to possess a firearm.  In conjunction with the stipulation, the State offered as Exhibit 1 the certified conviction packets for the prior convictions.

1

jury found the defendant guilty of attempted manslaughter and of being a felon in possession of a firearm.

On October 22, 2018, the State filed a multiple bill of information. The defendant filed a Motion for Post-Verdict Judgment of Acquittal, which the trial court denied. The defendant was sentenced to serve twenty years for attempted manslaughter and twenty years for being a felon in possession of a firearm, to be served consecutively. Defense counsel objected to the sentences, but did not file a written motion to reconsider sentence.

The defendant appeals the non-unanimous ten-to-two jury verdict, finding him guilty of attempted manslaughter. He also argues that his consecutive sentences are excessive.

## STATEMENT OF FACT

On May 27, 2016, at approximately 3:30 a.m., after a night of celebration with friends in a Warehouse District nightclub, the victim walked outside to relieve himself in some bushes. The defendant, in the company of his girlfriend, told the victim to "take it somewhere else." A brief verbal confrontation ensued, after which the defendant shot the victim multiple times and fled the scene in a blue vehicle.

NOPD Officer Daniel Oquendo responded to the shooting, which occurred in the 600 block of Fulton Street. The victim had been shot in the back and leg and was unable to communicate. Crime lab technicians photographed and processed the scene for evidence. Officer Oquendo located six shell casings and a bullet fragment located at the scene. Witnesses described the shooter as a thin black male approximately twenty-seven years old, having a scar on his face, carrying a white, gold-studded Michael Kors backpack, and wearing a white shirt and gray jogging

2

pants. After concluding his investigation at the scene, Officer Oquendo relocated to University Medical Center. He was unable to interview the victim because he was in critical condition and unable to speak. Officer Oquendo learned from medical personnel that the victim sustained eight gunshot wounds.

During cross-examination, Officer Oquendo recalled speaking to Marcus Gardner, a witness and friend of the victim, from whom he learned that the shooter fled the scene in either a blue or black BMW or Altima.

Approximately twenty-four hours after the shooting, Detectives Patrick Guidry and Steve Nolan interviewed the victim at University Medical Center. Guidry learned that the shooter and a female companion fled in a blue 2016 Nissan Altima. Det. Guidry identified a vehicle matching that description from the NOPD field interview database of traffic stops. Further investigation identified the vehicle as belonging to Latoya Chase, who fit the description of the female that witnesses saw with the shooter on the night of the incident. The victim viewed a photographic lineup of several females, including Ms. Chase.[2] However, he was unable to make an identification.

Further investigation developed the defendant as a suspect. Det. Guidry explained that he received information that an FBI confidential informant had knowledge that the defendant, in the company of his girlfriend, Samira Osgood, shot someone on Fulton Street. The informant also said that a .38 caliber pistol was used in the shooting.[3] An investigation of defendant's criminal history revealed that he had a New Orleans address and was on parole at the time of the shooting. The detective compiled two photographic lineups, each containing a

---

[2] Ms. Chase was subsequently determined to have nothing to do with the incident.
[3] The shell casings recovered at the scene were .38 caliber.

picture of the defendant but different filler photos. The victim identified the defendant as the shooter from one of the lineups, and Mr. Gardner identified the defendant from the other lineup as the person he saw shoot the victim.[4] Det. Guidry secured an arrest warrant for the defendant on the charge of attempted murder. The defendant was arrested at his residence on Pleasant Street in the company of Ms. Osgood. The eyewitness, Mr. Gardner, subsequently identified Ms. Osgood from a photo lineup as the female present with the defendant at the time of the shooting.

Incident to the search of the vehicle (a Hyundai Elantra)[5] located at the defendant's residence, the police confiscated a Michael Kors brand purse containing two cellphones, a Munchkin brand backpack, one plastic bag containing a rocklike substance and a second plastic bag holding a white powdery substance and nine pain pills. During his testimony, Det. Guidry identified the items seized from the defendant's vehicle.

Mr. Gardner recounted the March 27, 2016, early morning shooting in the Warehouse District. Mr. Gardner said he, the victim and friends were celebrating a cousin's wedding, which was to take place later in the day. About 3:00 a.m., the celebrants left a nightclub in the 600 block of Fulton Street. Mr. Gardner was speaking with someone when he heard an argument at the end of the block. When he investigated, he realized that the victim was engaged in a verbal confrontation with the defendant. There had been no contact between the victim and the defendant; however, as Mr. Gardner attempted to defuse the situation, the armed

---

[4] Det. Guidry e-mailed the photo lineup to Mr. Gardner from which he identified the defendant as the shooter. Mr. Gardner did not make the identification in person as he was unable to return to New Orleans.
[5] The vehicle was rented in the name of Ms. Osgood's aunt.

defendant pushed him. Mr. Gardner convinced the victim to walk away from the defendant. However, the victim and defendant continued to exchange words. The victim told the defendant, "F--- you," then turned and walked away. The defendant shot the victim several times then fled the scene in a blue Nissan. Mr. Gardner identified the defendant as the shooter from the photo lineup the police emailed him three weeks after the incident. During cross-examination, Mr. Gardner said that the victim and their friends had been partying since about midnight. Mr. Gardner did not notice that the defendant was armed until the defendant pushed him. Mr. Gardner gave an officer at the scene a description of the shooter and later spoke to a detective at the University Hospital.

The victim testified that prior to the shooting he was employed for ten years as a boilermaker in Baton Rouge; however, because of his gunshot wounds he is no longer able to work. The victim and his wife were in town to attend a wedding, and he said that about 3:00 a.m., on March 27, 2016, the Warehouse District night club where he and friends had been celebrating was closing for the night. Before exiting, he walked to the rear of the club to use the restroom but the line was too long so he left. He walked about a block from the night club and prepared to relieve himself in some bushes, when the defendant told him he could not do that in that area. The two exchanged words and the victim's friend, Mr. Gardner, attempted to quell the confrontation by placing himself between the victim and the defendant. The victim cursed the defendant then turned and walked away. The victim heard someone scream and turned around to see the defendant shooting at him. He was struck by eight bullets, the first two to his back. The defendant continued to fire as the victim fell down. The victim's injuries required seven surgical procedures to repair the damage, and he anticipated additional medical

5

procedures to correct the damage. He was unable to walk for more than a year. The victim said he was unarmed at the time of the shooting and denied knowing the defendant.

## DISCUSSION

### *Errors Patent*

A review for errors patent on the face of the record reveals none.

### *Assignment of Error No. 1:*

In his first assignment of error, the defendant argues that the trial court erred in accepting as legal the non-unanimous jury verdict rendered on the attempted manslaughter charge. He contends the non-unanimous jury verdict violates due process of law. This argument was recently considered and rejected by this Court in *State v. Jenkins,* 2018-0253 (La. App. 4 Cir. 4/3/19), 267 So.3d 1178.

In *Jenkins,* the defendant was charged with second degree murder, which carried a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, for a shooting that occurred in 2014. The defendant was convicted of the lesser crime of manslaughter by a ten-to-two jury verdict. He appealed, arguing that the non-unanimous jury verdict violated the Sixth and Fourteenth Amendment to the United States Constitution and the Louisiana Constitution.

In rejecting the defendant's argument in *Jenkins*, this Court concluded:

This Court acknowledges that . . . La. Const. Art. 1 § 17 has been amended to prohibit non-unanimous verdicts for crimes committed on or after January 1, 2019; however, the Louisiana Supreme Court has not ruled that non-unanimous jury verdicts for crimes committed prior to January 1, 2019 unconstitutional. Generally, Louisiana follows the rule that "a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed therein." *State v. Cousan*, 1994-2503, pp. 17-18 (La. 11/25/96), 684 So.2d 382,

6

392-393. The crime in this instant matter occurred in June 2014, which was before January 1, 2019.

*Jenkins*, 2018-0253, p. 20, 267 So.3d at 1189-90.

In *State v Warner*, 2018-0739, p. 24 (La. App. 4 Cir. 5/29/19), ___ So.3d

____, ____, 2019 WL 2293736, this Court recently held:

Louisiana follows the general rule that 'a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed therein.' *State v. Cousan*, 1994-2503, pp. 17-18 (La. 11/25/96), 684 So.2d 382, 392-393. Further, La. C.Cr. P. art. 782 [also amended in 2018] provides that the amendment to La. Const. Art. I § 17 requiring unanimous juries does not have retroactive effect.

The crime in this instant case occurred in 2016, and the defendant was

convicted in 2018. Thus, the recent constitutional amendment requiring

unanimous verdicts has no effect on the current case. Before the amendments to

La. Const. Art. I § 17 and La. C.Cr.P. art. 782, and at the time of the instant

offense, the constitutionality of non-unanimous jury verdicts was upheld in both

*State v. Bertrand,* 2008-2215, 2008-2311 (La. 3/17/09), 6 So.3d 738, and *Apodaca*

*v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). *See also State v.*

*Johnson*, 2018-0409, p. 25 (La. App. 4 Cir. 3/13/19), 266 So.3d 969, 984,

(reiterating that the 2018 amendments are prospective). Moreover, it is important

to note that the Louisiana Supreme Court has not ruled that non-unanimous jury

verdicts for crimes committed prior to January 1, 2019, are unconstitutional.

In *State v. Ramos*, 2016-1199 (La. App. 4 Cir. 11/2/17), 231 So.3d 44, writ

denied, 2017-2133 (La. 6/15/18), 257 So.3d 679, and writ denied *sub nom*, *State ex*

*rel. Evangelisto Ramos v. State*, 2017-1177 (La. 10/15/18), 253 So.3d 1300, the

defendant argued that the trial court erred in denying his motion to require a

unanimous jury verdict. This Court held that under current jurisprudence from the

U.S. Supreme Court, non-unanimous 12-person jury verdicts are constitutional. We recognize that on March 18, 2019, the United States Supreme Court granted certiorari in *Ramos* to consider whether the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous verdict. *Ramos v. Louisiana,* No. 18-5924, —— U.S. ——, 139 S.Ct. 1318, —— L.Ed.2d ——, 2019 WL 1231752 (U.S. Mar. 18, 2019).

Considering the above referenced jurisprudence as applied to the facts of this case, we find no merit in the defendant's first assignment of error.

***Assignment of Error No. 2:***

In a second assignment of error, the defendant complains that his consecutive sentences are excessive. The State counters, arguing that the defendant failed to file a motion to reconsider sentence and, therefore, he is precluded from raising this assignment of error on appeal.

La. C.Cr.P. art 881.1 provides in pertinent part:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.

> B. The motion shall be oral at the time of sentence or shall be in writing thereafter and shall set forth the specific grounds on which the motion is based.

> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

"[T]his Court has repeatedly held that the failure to file a motion to reconsider sentence *or* to object in any way to the sentence at the time it is imposed precludes a defendant from raising a claim about his sentence on appeal." *State v.*

8

*Spencer,* 2014-0003, p. 14 (La. App. 4 Cir. 10/8/14), 151 So.3d 816, 825

(emphasis added) (citations omitted).

Here, the defendant did not file a written motion to reconsider sentence.
However, the trial transcript indicates that defense counsel entered a general
objection following the imposition of sentence. Thus, we consider the issue to be
preserved for review on appeal, and we will address the merits of this assignment
of error.

In *State v. Norah*, 2012-1194, p. 37-39 (La. App. 4 Cir. 12/11/13), 131 So.3d
172, 195-96, this Court set out the standard of review for an excessive sentence:

> Article I, Section 20 of the Louisiana Constitution of 1974
> prohibits any law from subjecting a person to excessive punishment.
> The excessiveness of a sentence is a question of law reviewable by
> this Court under its appellate jurisdiction. *See* La. Const. Art. 5, 10.
> The Louisiana Constitution differs from the Eighth Amendment to the
> U.S. Constitution in its explicit prohibition of excessive sentences.
> This "deliberate inclusion by the redactors of the Constitution of a
> prohibition against excessive as well as cruel and unusual punishment
> broadened the duty of this court to review the sentencing aspects of
> criminal statutes." *State v. Baxley*, 94-2982, p. 4 (La. 5/22/95), 656
> So.2d 973, 977. A sentence is constitutionally excessive if "it makes
> no measurable contribution to acceptable goals of punishment and is
> nothing more than the purposeless imposition of pain and suffering
> and is grossly out of proportion to the severity of the crime." *State v.
> Davis*, 449 So.2d 452, 453 (La. 1984).

> The prohibition against excessive sentences requires review of
> statutory sentencing guidelines in relation to the particular offense and
> offender. *See State v. Sepulvado*, 367 So.2d 762, 766 (La. 1979).
> "[P]enalties provided by the legislature reflect the degree to which the
> criminal conduct is an affront to society." *State v. Landry*, 2003-
> 1671, p. 8 (La. App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239. The
> range of discretion granted a sentencing judge in handing down a
> sentence fluctuates depending on the interactivity of the facts of a
> particular case, the permissible criminal sanctions, and the range of
> conduct prohibited by the particular criminal statute that the defendant
> is convicted of violating. *See Sepulvado*, 367 So.2d at 766. While a
> legislature's determination of what is the appropriate minimum
> sentence for a particular offense should be afforded deference by the
> judiciary, courts may still deviate below the mandatory minimum
> sentence when "there is clear and convincing evidence in the

9

particular case before it which would rebut [the] presumption of constitutionality [of the sentencing scheme of the statute that forms the basis of sentencing as applied to this particular defendant].” *State v. Johnson*, 97-1906, p. 7 (La. 3/4/98), 709 So.2d 672, 676.

> A reviewing court should not set aside a sentence imposed by a trial court absent a *manifest* abuse of this discretion. *See State v. Batiste*, 2006-0875, p. 17 (La. App. 4 Cir. 12/20/06), 947 So.2d 810, 820 (emphasis added). Our sentence review should strive only to correct “abuses of sentencing power” by the district judge, *Sepulvado*, 367 So.2d at 767, and not to attempt to impose sentences that we deem more appropriate. *See State v. Soraparu*, 97-1027, p. 1 (La. 10/13/97), 703 So.2d 608, 608 (*per curiam*). “[A] remand for resentencing is appropriate only when there appears to be a substantial possibility that the defendant’s complaints of an excessive sentence have merit.” *Id.*, 97-1027 at p. 1; 703 So.2d at 608. (internal quotations and punctuation omitted). *See also State v. Black*, 98-0457, p. 9 (La. App. 4 Cir. 3/22/00), 757 So.2d 887, 892.

*Id. See also State v. Dove,* 2015-0783, pp. 31-32 (La. App. 4 Cir. 5/4/16), 194 So.3d 92, 113-14.

La. C.Cr. P. art. 883 provides that:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run consecutively.

In *State v. Gray*, 2016-1195, pp. 35-36 (La. App. 4 Cir. 6/28/17), ___ So.3d ___, ___, 2017 WL 3426021, *19, this Court explained:

> Despite the presumptive status given to concurrent sentences for crimes committed as part of a single transaction, a trial court has discretion to impose consecutive sentences on the basis of other factors, including the offender’s past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community. *State v. Marcelin*, 12-0645, p. 17 (La. App. 4 Cir. 5/22/13), 116 So.3d 928, 938–39 (quoting *State v. Thomas*, 98-1144 (La. 10/9/98), 719 So.2d 49). When consecutive sentences are imposed for crimes arising out of the same act, the district court must articulate particular justification for such sentences beyond a mere articulation of the standard sentencing guidelines set forth in La.

10

C.Cr.P. art. 894.1. *Marcelin*, 12-0645 at p. 19, 116 So.3d at 939; *State v. Williams*, 11-0414, p. 29 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 777 (quoting *State v. Jefferson*, 04-1960 p. 39 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, 604). Accordingly, an appellate court must analyze whether the trial court provided additional reasons to justify consecutive sentencing.

In this case, the defendant complains the trial court mistakenly failed to recognize as mitigating factors the victim's provocation of the defendant by urinating near him; the victim's cursing the defendant; that the evidence as to possession of a firearm was circumstantial and contradictory; that the weapon was never found; and that the victim's injuries were to the lower part of his body.

In ordering that the sentences in this case be served consecutively, the trial court reasoned:

> The defendant is in need of correctional treatment, or a custodial environment, that can be provided most effectively by his commitment to an institution. Second, a lesser sentence would deprecate the seriousness of the defendant's crime. Third, the defendant's conduct during the commission of the offense manifested deliberate cruelty to the victim. Fourth, the offense resulted in significant permanent injury and significant economic loss of [sic] the victim and/or his family. Fifth, the defendant used a dangerous weapon in the commission of the offense. Sixth, the defendant in this case foreseeably endangered human life by discharging a firearm during the commission of the offense, which has, as an element, the use, attempted use, or threatened use, of physical force against a person of another, which by of [sic] its very nature involves a substantial risk that physical force may be used in the course of committing the offense. And sixth, the offender used a firearm, or other dangerous weapon, while committing, or attempting to commit, an offense, which has, as an element, the use, attempted use, or threatened use, of physical force against a person of another, which by its very nature involves a substantial risk that physical force may be used in the course of committing the offense. Let the record also reflect that the victim was shot eight times, twice in the back.

The record supports the imposition of consecutive sentences. The defendant shot the victim eight times because the defendant took umbrage with the victim's attempt to relieve himself in some bushes. Moreover, even as the victim fell to the

ground after the initial shots, the defendant continued to shoot the victim, evidencing deliberate cruelty in causing as much harm to the victim as possible.

The victim's wife provided an impact statement, as follows:

> The actions of [the defendant] have not only affected and changed my children and I lives, but the entire community forever. My husband was more than just a father, brother, uncle, son, cousin and friend. He was also a Youth Sport's coach, a Teen Mentor, and a hard-working Industrial Supervisor. A supervisor who had taken extreme pride in going to work, and being able to give his family a better life. A life that has tremendously been altered because of the senseless and cruel actions of [the defendant].

> I can't even begin to describe the feelings of terror and emptiness I felt when I was beside my husband on his bed of affliction. You left [the victim] lying in the street like a wounded animal. Blood pouring from the bullet wound holes, as he laid helplessly fighting for his life. This night still haunts my children, because they are fearful to visit grandparents in New Orleans. My children are afraid that they will get shot like daddy. This night still haunts me, that I have experienced multiple forms of anxiety, and have to take medication. This night still haunts my husband that he suffers from Post-Traumatic Stress Disorder (PTSD), and has many sleepless nights. I spent over three months in the hospital with my husband and witness[ed] him endure six surgeries. . . . The pain I watched my husband suffer while hospitalized was unbearable to witness. There were times that my husband would say he wished [the defendant] would have finished him off as the pain was the worse [sic] he had ever felt.

The trial court considered the character letters submitted on the defendant's behalf and heard defendant's father's testimony apologizing for his son. We also note that the defendant addressed the court requesting forgiveness and leniency, but never apologized to the victim or the victim's family for pain and anguish caused by his actions.

The imposition of consecutive sentences in this case is not grossly out of proportion to the facts of this case and the pain, suffering, and economic loss the defendant caused the victim and his family. This assignment is meritless.

## DECREE

For the foregoing reasons, we find no merit in the defendant's assignments of error. Accordingly, we affirm the convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED**